IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

TN AMERICAS LLC,

    *Plaintiff*,

    v.

ROBERT STRANG,

    *Defendant*.

Case No. 1:23-cv-00242-JRR

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## <u>MEMORANDUM OPINION</u>

Pending before the court is Defendant Robert Strang's Motion to Dismiss. (ECF No. 6; the "Motion.") The court has reviewed all papers. No hearing is necessary. Local Rule 105.6 (D. Md. 2023). For the reasons that follow, by accompanying order, the Motion will be denied.

## I. <u>BACKGROUND</u>[1]

Plaintiff TN Americas LLC ("TNA") is a Delaware limited liability company with its principal place of business in Columbia, Maryland. (ECF No. 1 at 3.) Defendant Robert Strang was a citizen of Columbia, Maryland during the relevant time period.[2] *Id.* This case arises from Strang's alleged scheme to steal TNA's confidential trade secrets. *Id.* at 1.

TNA is a subsidiary of Orano, a leading technology and services provider for the nuclear full cycle industry. (ECF No. 1 at 1.) Strang is the former President of Transport Logistics, Inc. ("TLI"), a company Orano acquired in October 2021. *Id.* at 2. Since the closing date of Orano's acquisition of TLI, Orano has been integrating TLI's business into its U.S. nuclear transports

---

[1] For purposes of this memorandum, the court accepts as true the well-pled facts set forth in the Complaint. (ECF No. 1.)

[2] In the Motion, Strang notes that he currently resides in Goodyear, Arizona. (ECF No. 6 at 1, n.1.)

business, which is operated under TNA. *Id.* As part of the acquisition, Strang became the Business

Line Director for Transport & Services at TNA. *Id.*

In connection with his job offer at TNA, Strang signed a Restrictive Covenant Agreement[3]

("RCA"), which contained covenants of non-competition, non-solicitation, and confidentiality.

(ECF No. 1 at 2.)  The non-competition covenant provides in pertinent part:

> 5.1.    At all times while employed, and during the twelve (12)
> months immediately following the termination of employment
> (except where (i) such termination of employment is by Employer
> for cause, in which case this restrictive period shall be the six (6)
> months following termination of employment, or (ii) such
> termination is by reason of an involuntary reduction in force, in
> which case the restriction in this Section 5.1 will not apply),
> Employee shall not, directly or indirectly, provide Competitive
> Services (as defined below) within the Restricted Territory (as
> defined below) to or for the benefit of a Direct Competitor[4] (as

---

[3] In ruling on a 12(b)(6) motion, a court usually does not consider material outside of the complaint. A court may consider documents attached to motions papers if the document is "integral to and explicitly relied on in the complaint and [if] the plaintiffs do not challenge its authenticity." *Am. Chiropractic Ass'n, Inc. v. Trigon Healthcare Inc.*, 367 F.3d 212, 234 (4th Cir. 2004) (quoting *Phillips v. LCI Int'l Inc.,* 190 F.3d 609, 618 (4th Cir. 1999)). "An integral document is a document that by its 'very existence, and not the mere information it contains, gives rise to the legal rights asserted.'" *Chesapeake Bay Found. Inc., v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d. 602, 611 (D. Md. 2011) (quoting *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007)). The RCA is integral to the Complaint because the Complaint expressly references the RCA; and TNA's rights on which it sues arise in part from the RCA. Further, neither party disputes the authenticity of the RCA. Therefore, the court will consider the RCA without converting the Motion into one for summary judgment. *Am. Chiropractic Ass'n, Inc.*, 367 F.3d at 234 (quoting *Phillips*, 190 F.3d at 618); *Chesapeake Bay Found. Inc.*, 794 F. Supp. 2d. at 611 (quoting *Walker*, 517 F. Supp. 2d at 806).

[4]  The RCA defines "Direct Competitor" as follows:

> 5.4.    A "Direct Competitor" is an entity or individual that offers, sells or
> provides products or services (including but not limited to packaging, products,
> logistics, maintenance, and long-term management) for: (i) the transportation,
> storage, and/or disposal of spent nuclear fuel and/or nuclear waste; (ii) the
> domestic and international transportation of radioactive cargoes for the "front"
> and "back-end" sectors of the nuclear fuel cycle, by sea, air, rail, and road; (iii)
> the design, licensing, procurement, and manufacturing of nuclear fuel or waste
> packaging; or (iv) the storage, washing, recertification and disposal of natural
> uranium cylinders (such products and services of the type described in clauses (i)
> through (iv) above, being "Nuclear Products and Services"); in each case, in the
> United States during the 12-month restricted period in competition with Employer
> or the Company, where the products or services offered in competition are the
> same or substantially similar in purpose or function to those offered, sold or
> provided by Employer and/or the Company's Business Operations during the term
> of this Agreement, including as of the date employment ends.

(ECF No. 1-1 at 10.)

defined below), regardless of whether the services are provided as an employee, owner, manager, director, officer, consultant, or in some other capacity. In the event a court of competent jurisdiction determines that the 12-month restrictive period set forth above exceeds limitations permitted by law, the Parties agree that the restrictive period shall be reduced to six (6) months.

(ECF No. 1-1 at 9.)

The non-solicitation covenant provides in relevant part:

> 6.1.   At all times while employed and during the twelve (12) months immediately following termination of employment, regardless of the circumstances, Employee shall not, through Employee's own actions, or through an agent, representative or other third party acting in concert with Employee, and regardless of whether Employee does them by or for himself alone, or as an officer, director, owner, member, stockholder, partner, investor, Employee, consultant or agent for or on behalf of any other person or entity: (i) Solicit (as defined below) the Nuclear Products and Services (as defined above) business of a Customer (as defined below) by communicating directly with the Customer (regardless of who initiates the communication) when part of the communication by Employee includes a discussion or offer to provide any such Nuclear Products and Services to the Customer that are designed to compete with or replace the products and services that Employer has been or is providing to that Customer, (ii) accept an order, enter into a contract, supply or provide Nuclear Products and Services to a Customer if Employer is then currently offering, selling, making, or providing those same products or services, or products and/or services that are substantially the same in function and purpose, (iii) disrupt or attempt to disrupt Employer's business relationship with a Customer (as defined below) or Supplier (as defined below) by directly or indirectly, Soliciting (as defined below), requesting, suggesting, encouraging or advising the Customer or Supplier to cancel, terminate, not renew, limit or withdraw all or any portion of its business with Employer, and/or (iv) Solicit (as defined below) a Key Employee (as defined below) with whom Employee had Business Contact (as defined below in Section 6.2 within the twelve (12) month period immediately preceding Employee's termination of employment (regardless of who initiates the initial contact) to leave employment with Employer in order to accept or obtain a similar job working for a Direct Competitor (as defined above in Section 5.2). In the event a court of competent jurisdiction determines that the 12-month non-solicitation restrictive period set forth in this Section 6.1 exceeds limitations permitted by law, the

Parties agree that this restrictive period shall be reduced to six (6) months.

(ECF No. 1-1 at 11-12.)  The RCA provides that the term solicit "means to contact, recruit, cause, induce, influence, encourage, entice, facilitate, assist, or otherwise take away from the Employer." *Id.* at 13.

The confidentiality covenant provides:

> 3.1.    Employee recognizes and acknowledges that he or she will have significant access to the non-public, proprietary and confidential information of Employer and the Company (including information received by them under an obligation of confidentiality from their licensors, customers, and other third parties), including but not limited to: financial data; customer lists and information; prospective customer lists and information; supplier lists and information; contractor lists and information; contracts; pricing information; sales strategy, tactics, or methods; information pertaining to products or services under development; internal company policies, procedures and reports of any kind; software; all other data, drawings and other technical, strategic, and commercial information whatsoever relating to the development and marketing of Employer's services and products of any kind, information amounting to trade secrets as defined by state and federal law; and any other information and/or materials that are identified as confidential information by Employer or the Company (the "Confidential Information"). Certain of this Confidential Information may qualify for protection as a trade secret due to its special value or unique character to Employer. Confidential Information protected by this provision does not include information that is generally available to and known by the public, provided that such disclosure to the public is through no direct or indirect fault of Employee. Employee understands and agrees that the Confidential Information, regardless of where the information is maintained (including, but not limited to, Confidential Information that may be saved on Employee's personal mobile device, tablet, computer, etc.) shall at all times remain the exclusive property of Employer.

> 3.2.    Employee agrees that during the term of his employment and for the ten (10) years immediately following the termination of his employment for any reason, Employee will: (i) not disseminate, disclose or use any such Confidential Information for any reason or purpose whatsoever other than that of performing the Services without the prior written approval of Employer; (ii) not copy onto

4

Employee's personal mobile device, tablet or computer, forward to Employee's personal email address, or delete any Confidential Information while employed unless specifically authorized to do so in writing by the Employer; (iii) use all reasonable care in handling and securing the Confidential Information; (iv) abide by any further confidentiality obligations requested by the Employer; and (v) immediately notify Employer in writing of any misuse or misappropriate of such information that may come to Employee's attention . . . .

(ECF No. 1-1 at 5-6.)

TNA alleges that on November 4, 2022, Strang abruptly left TNA. (ECF No. 1 at 2, 11.) Shortly thereafter, on December 1, 2022, Strang was announced as the CEO of RSB Logistics. *Id.* TNA alleges that RSB Logistics is a direct competitor of TNA that transports nuclear material domestically and internationally. *Id.* After hearing of Strang's new position at RSB, TNA immediately conducted a search of Strang's company computer and email account. *Id.* TNA discovered that Strang forwarded confidential data to his personal email account prior to his departure from TNA. *Id.*

On December 12, 2022, TNA put Strang and RSB on written notice that Strang was in violation of his non-competition, non-solicitation, and confidentiality covenants. (ECF No. 1 at 2.) In response, RSB advised that it terminated Strang as its CEO; Strang did not respond to the letter. *Id.* TNA alleges that Strang remains in possession of TNA's confidential data and has shown a willingness to flout the covenants that he voluntarily executed with TNA. *Id.*

On January 30, 2023, TNA filed the Complaint which sets forth eight counts: (Count I) Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1831, *et seq.*; (Count II) Misappropriation of Trade Secrets in Violation of the Maryland Uniform Trade Secrets Act ("MUTSA"), MD. CODE ANN., COM. LAW §§ 11-1201, *et seq.*; (Count III) Breach of Contract – Non-Competition Agreement; (Count IV) Breach of Contract – Non-

Solicitation Agreement; (Count V) Breach of Contract – Confidentiality; (Count VI) Breach of Fiduciary Duty; (Count VII) Conversion;[5] and (Count VIII) Intentional Misrepresentation by Concealment/Non-Disclosure.[6] (ECF No. 1.)

The prayer for relief seeks: (i) an order "granting TNA permanent injunctive relief restraining Defendant from using, retaining, utilizing, disseminating and/or disclosing any trade secret, confidential information or other proprietary information of TNA on behalf of any other party, or on his or their own behalf;" (ii) an order "granting TNA permanent injunctive relief requiring Defendant to return immediately to TNA all records and other property (in any form) pertaining in any way to TNA, and requiring Defendant to identify all computers, databases or other storage means or devices on which any such data was downloaded or stored;" (iii) an order "granting TNA permanent injunctive relief requiring Defendant to refrain from working for a direct competitor of TNA for one year, and requiring Defendant to refrain from soliciting TNA customers;" (iv) an order "requiring Defendant to account for all gains, proceeds, profits, and advantages that he earned by virtue of the improper conduct as alleged herein;" (v) an order "holding Defendant liable for and directing Defendant to pay to TNA statutory damages in the amount to be determined by the Court by virtue of the improper conduct as alleged herein;" (vii) damages in excess of $75,000; (viii) punitive damages; (ix) statutory damages; (x) reasonable attorneys' fees; (xi) any other this relief this court deems just and equitable. (ECF No. 1 at 17-18.)

Strang moves to dismiss on several grounds: (1) TNA's DTSA and MUTSA claims— Counts I and II—fail because TNA does not identify the specific confidential information Strang misappropriated, and TNA does not allege any harm to its business; (2) TNA's breach of non-competition claim—Count III—fails because TNA fails to allege that it suffered damages; (3)

---

[5] The Conversion claim is mislabeled "Count IX."
[6] The Intentional Misrepresentation claim is mislabeled "Count X."

TNA's breach of non-solicitation claim—Counts IV—fails because TNA does not allege that Strang solicited or sought any of TNA's customers; (4) TNA's breach of confidentiality claim—Count V—fails because it is preempted by MUTSA and TNA fails to allege that it suffered damages; (5) TNA's breach of fiduciary duty claim—Counts VI—fails because TNA does not provide support for its claim that it was harmed by Strang's employment with RSB; (6) the conversion claim—Count VII—fails because it is preempted by MUTSA and TNA has not pled any details about the alleged conversion; and (7) the intentional misrepresentation claim—Count VIII— fails because TNA's allegations do not meet the heightened pleading standard and TNA fails to allege that it suffered compensable injury from the misrepresentation.  (ECF No. 6-1 at 5-16.)

## II.    LEGAL STANDARDS

### A.    Federal Rule of Civil Procedure 12(b)(6)

"'The purpose of Rule 12(b)(6) is to test the sufficiency of a complaint' and not to 'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'"  *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006) (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999)).  Accordingly, a "Rule 12(b)(6) motion should only be granted if, after accepting all well-pleaded allegations in the plaintiff's complaint as true and drawing all reasonable factual inferences from those facts in the plaintiff's favor, it appears certain that the plaintiff cannot prove any set of facts in support of his claim entitling [her] to relief."  *Edwards*, 178 F.3d at 244 (*citing Republican Party v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992)).

"While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  "Factual allegations must be enough to raise a right to relief above the speculative level on the assumption

that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). "A complaint that provides no more than 'labels and conclusions,' or 'formulaic recitation of the elements of a cause of action,' is insufficient." *Bourgeois v. Live Nation Ent., Inc.*, 3 F. Supp. 3d 423, 434 (D. Md. 2014) (quoting *Twombly*, 550 U.S. at 555). "The [c]ourt must be able to deduce 'more than the mere possibility of misconduct'; the facts of the complaint, accepted as true, must demonstrate that the plaintiff is entitled to relief." *Evans v. 7520 Surratts Rd. Operations, LLC*, No. PX-21-1637, 2021 U.S. Dist. LEXIS 221041, at *4 (D. Md. Nov. 16, 2021) (quoting *Ruffin v. Lockheed Martin Corp.*, 126 F. Supp. 3d 521, 526 (D. Md. 2015)).

### B.      Federal Rule of Civil Procedure 9(b)

"Rule 9(b) requires particularity when pleading 'fraud or mistake,' while allowing 'malice, intent, knowledge, and other conditions of a person's mind to be alleged generally.'" *Ashcroft*, 556 U.S. at 686. A plaintiff "must, at a minimum, describe the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Bourgeois*, 3 F. Supp. 3d at 435 (quoting *U.S. ex rel. Owens v. First Kuwaiti Gen'l Trading & Contracting Co.*, 612 F.3d 724, 731 (4th Cir. 2010)). "Claims that sound in fraud, whether rooted in common law or arising under a statute, implicate the heightened standard of Rule 9(b)." *Layani v. Ouazana*, No. 20-420, 2021 U.S. Dist. LEXIS 39894, at *61 (D. Md. Mar. 3, 2021); *see Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (quoting FED. R. CIV. P. 9(b) and holding that "the MCPA claim, which sounds in fraud, is subject to the heightened pleading standards of Federal Rule of Civil Procedure 9(b), which requires a plaintiff to plead 'with particularity the circumstances constituting fraud'").

Rule 9(b) serves four purposes:

> First, the rule ensures that the defendant has sufficient information to formulate a defense by putting it on notice of the conduct complained of . . . .  Second, Rule 9(b) exists to protect defendants from frivolous suits. A third reason for the rule is to eliminate fraud actions in which all the facts are learned after discovery. Finally, Rule 9(b) protects defendants from harm to their goodwill and reputation.

*Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (citation omitted).  "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts."  *Id.*; *see St. Michael's Media, Inc. v. Mayor and City Council of Balt.*, No. ELH-21-2337, 2022 WL 137866, at *17 (D. Md. Jan. 14, 2022) (noting that "Rule 9(b) aims 'to eliminate fraud actions in which all the facts are learned after discovery'").

## III.  ANALYSIS

As an initial matter, Maryland law applies to TNA's claims under state law.  A federal district court considering state common law claims applies the substantive law of the forum state. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938).  The substantive law of the forum state includes its choice-of-law rules.  *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496 (1941).  Maryland courts ordinarily apply the tort law of the place where the tort occurred under the doctrine of *lex loci delicti*.  *Sherrod v. Achir,* 149 Md. App. 640, 647 (2003).  The alleged events took place in Maryland; therefore, the substantive tort law of Maryland governs TNA's tort claims.  With respect to TNA's contract claims, "interpretation of private contracts is ordinarily a question of state law." *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.*, 489 U.S. 468, 474 (1989). In interpreting a contract, Maryland courts apply the law of the state in which the contract was formed unless the parties agree to be bound by the law of another state.  *Cunningham v. Feinberg*,

441 Md. 310, 326 (2015).  In the present case, the parties agreed that "this Agreement and any question concerning its validity, construction or performance hereunder shall be governed by the laws of the State of Maryland without regard to any conflict of law provisions or principles to the contrary." (ECF No. 1-1 at 16.)  Accordingly, Maryland substantive law applies to TNA's contract claims.

### A.    DTSA and MUTSA (Counts I and II)

In Counts I and II, TNA brings claims against Strang for misappropriation of trade secrets under DTSA and MUTSA.  (ECF No. 1 at 6-9.)

The elements of a misappropriation claim under DTSA and MUTSA are substantively the same.  See *Philips N. Am. LLC v. Hayes*, No. ELH-20-1409, 2020 WL 5407796, at *7 (D. Md. Sept. 9, 2020) ("To establish a claim under the DTSA or the MUTSA, a plaintiff must show that the documents at issue are trade secrets and that the defendant misappropriated those trade secrets") (citing 18 U.S.C. § 1836(b)(1); MD. CODE ANN., COM. LAW §§ 11-1201 to 11-1203)). Specifically, "[t]o state a claim under DTSA, a plaintiff must allege that: '(1) it owns a trade secret which was subject to reasonable measures of secrecy; (2) the trade secret was misappropriated by improper means; and (3) the trade secret implicates interstate or foreign commerce.'" *Blades of Green, Inc. v. Go Green Lawn & Pest, LLC*, 598 F. Supp. 3d 348, 355 (D. Md. 2022) (quoting *Philips N. Am. LLC*, 2020 WL 5407796, at *7).  Under MUTSA, a plaintiff must allege that "(1) it possessed a valid trade secret, (2) the defendant acquired its trade secret, and (3) the defendant knew or should have known that the trade secret was acquired by improper means." *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 660 (4th Cir. 1993) (citing MD. CODE ANN., COM. LAW § 11-1201(c)(1)).  "The primary difference between the MUTSA and the DTSA is that the DTSA only allows for a private cause of action where the alleged trade secrets are 'related to a product

or service used in, or intended for use in, interstate or foreign commerce.'" *Philips N. Am. LLC*, 2020 WL 5407796, at *8 (quoting 18 U.S.C. § 1836(b)(1)).

Strang argues that Counts I and II fail because TNA does not specifically allege what trade secrets Strang misappropriated and TNA does not allege any specific harm or detriment suffered.[7] (ECF No. 6-1 at 4-5, 7-8.)

### 1.   *Trade Secrets*

DTSA and MUTSA define a trade secret in "substantially the same manner." *Md. Physician's Edge, LLC v. Behram,* DKC-17-2756, 2019 WL 4573417, at *5 (D. Md. Sept. 20, 2019). DTSA defines "trade secret" as:

> . . . all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
>
> > (A) the owner thereof has taken reasonable measures to keep such information secret; and
> >
> > (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information;

18 U.S.C. § 1839(3).

---

[7] Strang does not contest that TNA adequately alleges that the trade secrets are "related to a product or service used in, or intended for use, interstate or foreign commerce." At a motion to dismiss stage, the court is satisfied that the information relates to services used, and intended for use, in interstate and foreign commerce because TNA alleges that its business transports radioactive materials domestically and internationally. (ECF No. 1 at 2.) *See Philips N. Am. LLC*, 2020 WL 5407796, at *11 (explaining that at the motion to dismiss stage, it is sufficient that the plaintiff alleges that its business is both national and international); *Space Sys./Loral, LLC v. Orbital ATK, Inc.*, 306 F. Supp. 3d 845, 854-55 (E.D. Va. 2018) ("purported information relates to services used and intended for use in interstate and foreign commerce because it contains business plans, procurement strategies and subcontractor and vendor relationships").

MUTSA defines "trade secret" as:

> information . . . that:   (1)   derives   independent   economic
> value . . . from not being generally known to, and not being readily
> ascertainable by . . . other persons who can obtain economic value
> from its disclosure or use; and (2) is the subject of efforts . . . to
> maintain its secrecy.

MD. CODE ANN., COM. LAW § 11–1201(e).

"Maryland courts have repeatedly found that business plans, pricing and cost information, and customers lists for companies operating in competitive sales industries derive independent economic value from their confidentiality." *Philips N. Am., LLC*, 2020 WL 5407796, at *8; *see MCS Servs., Inc. v. Jones*, No. WMN-10-1042, 2010 WL 3895380 (D. Md. Oct. 1, 2010) (noting that "Maryland courts have previously recognized customer lists as trade secrets"); *Home Paramount Pest Control Cos. v. FMC Corp.*, 107 F. Supp. 2d 684, 692 (D. Md. 2000) ("There is no question that a customer list can constitute a trade secret.").  As the court stated in *Albert S. Smyth Co., Inc. v. Motes*, "[i]n a competition for sales, information about potential customers and their buying habits, a competitor's pricing, business strategies, and vendors is a windfall, granting the recipient a key to undercut the competition's pricing, outbid their vendor contracts, and attract their customers." CCB-17-677, 2018 WL 3635024, at *4 (D. Md. July 31, 2018) (finding documents containing customer lists, pricing sheets, and business strategies to be trade secrets); *see Philips N. Am. LLC*, 2020 WL 5407796, at *8-9 (finding that the plaintiff sufficiently alleged that the documents at issue qualify as trade secrets where the plaintiff alleged that the defendant "acquired and retained [the defendant's] business plans for 2019 and 2020, lists of pending orders and sales funnels for the entire United States, information regarding manufacturing status of completed sales, presentations regarding new Philips market initiatives, marketing and strategic

plans and detailed information regarding specific Philips customers, orders, pricing and sales initiatives").

In the present case, TNA alleges:

> TNA is in the nuclear material transportation and logistics business. TNA is continuously developing and refining certain confidential information, which it utilizes to properly serve its customers, improve upon its services, and expand its business. This information includes, but is not limited to, a confidential customer and client list, financial data, cost and pricing information, commercial information, and sales strategy (collectively "Confidential Information").

> TNA has long implemented reasonable means and methods to ensure that the Confidential Information remains secret, and has carefully compartmentalized the Confidential Information within its employee ranks so that only authorized employees are afforded access to it. The Confidential Information is closely guarded, and only made accessible to certain TNA employees with a need to know this information to perform their jobs. Under company policies, employees must use measures to safeguard Confidential Information using TNA information security resources. Upon an employee's separation from TNA, access to Confidential Information is revoked.

> By emailing copies of TNA's Confidential Information to himself, Strang has misappropriated TNA's trade secrets and confidential information, without the consent of TNA, to the detriment of TNA, and for his own commercial advantage, in violation of the Federal Defend Trade Secrets Act.

(ECF No. 1 ¶¶ 11-12, 24.)

Construed in the light most favorable to TNA and taken as true, the Complaint alleges TNA took reasonable steps to protect the confidential information, and that following Strang's departure in November 2022, TNA discovered that Strang "forwarded confidential TNA data to his personal email account prior to his departure from TNA." *Id.* at p. 2. In sum, TNA alleges that Strang emailed copies of "a confidential customer and client list, financial data, cost and pricing

information, commercial information, and sales strategy" after his departure from TNA.  *Id.* ¶¶ 11, 24.

Further, the Complaint adequately alleges that TNA took reasonable steps to protect the confidentiality of its records and their value is derived from their confidentiality.  Accordingly, TNA adequately alleges that the confidential records constitute trade secrets within the meaning of federal and state law.

### 2.   *Misappropriation*

The next element requires a plaintiff to allege that the trade secrets were misappropriated. Pursuant to DTSA, "a trade secret can be misappropriated when a person either (1) acquires a trade secret while knowing, or having reason to know, that the trade secret was acquired by improper means, 18 U.S.C. § 1839(5)(A), or (2) uses or discloses the trade secret after acquiring it through improper means, *id.* § 1839(5)(B)(i)."  *Brightview Group, LP v. Teeters*, 441 F. Supp. 3d 115, 132 (D. Md. 2020).  MUTSA defines "misappropriation" as:

> [d]isclosure or use of a trade secret of another . . . by a person who . . . knew or had reason to know that the person's knowledge of the trade secret was . . . [a]cquired under circumstances giving rise to a duty to maintain its secrecy or limit its use.

MD. CODE ANN., COM. LAW § 11–1201(c).  "Thus, a claim for misappropriation lies 'simply by demonstrating that the defendant acquired [the] trade secret by improper means, even if the plaintiff cannot show use of that trade secret.'"  *Brightview Group, LP*, 441 F. Supp. 3d at 132 (quoting *Sys. 4, Inc. v. Landis & Gyr, Inc.*, 8 Fed. Appx. 196, 200 (4th Cir. 2001)).  "DTSA further provides that the 'improper means' of acquiring a trade secret 'includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.'"  *Id.* (quoting 18 U.S.C. § 1839(6)(A)).  MUTSA's definition

of misappropriation and "improper means" again "mirrors the DTSA's definition." *Brightview Grp., LP*, 441 F. Supp. 3d at 132.

TNA alleges that Strang emailed copies of TNA's confidential information to himself prior to his departure from TNA and before he went to work for a direct competitor. (ECF No. 1 at 2.) TNA plausibly alleged that Strang used TNA's confidential information for his personal gain in violation of the RCA and, therefore, unlawfully misappropriated TNA's confidential information. Because TNA adequately alleges that this information is subject to trade secret protection pursuant to MUTSA and DTSA, and that Strang misappropriated these trade secret assets and information by emailing them to his personal email prior to his departure, the Motion will be denied as to Counts I and II.

### B.      Breach of Contract (Counts III, IV, and V)

In Counts III, IV, and V, TNA alleges that Strang breached the RCA's non-competition, non-solicitation, and confidentiality covenants.

"Maryland recognizes 'that restrictive covenants may be applied' to protect against 'the future misuse of trade secrets, routes or lists of clients, or solicitation of customers.'" *Ameritox, Ltd. v. Savelich*, 92 F. Supp. 3d 389, 401 (D. Md. 2015) (quoting *Becker v. Bailey*, 268 Md. 93, 97 (1973)). "Restrictive covenants are restraints on trade and must be reasonable to be valid." *Blades of Green, Inc. v. Go Green Lawn & Pest, LLC.*, 598 F. Supp. 3d 348, 359 (D. Md. 2022). "Under Maryland law, a restrictive covenant is enforceable only if: (1) the employer has a legally protected interest; (2) the covenant is no wider in scope and duration than reasonably necessary; (3) it does not impose an undue hardship on the employee; and (4) does not violate public policy." *Id.* Strang does not appear to argue that three restrictive covenants are unenforceable. Instead, Strang contends that TNA fails to allege that Strang breached the restrictive covenants.

"Under Maryland law, in order to state a claim for breach of contract, a plaintiff must allege 'with certainty and definiteness facts showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by the defendant.'" *Inst. of Mgmt. & Admin., Inc. v. Broadband Intel., Inc.*, No. AW-05-1853, 2006 WL 8460966, at *5 (D. Md. Jan. 25, 2006) (quoting *Continental Masonry Co., Inc. v. Verdel Constr. Co., Inc.*, 279 Md. 476, 480 (Md. 1977)).

### 1.    *Breach of Non-Competition Covenant (Count III)*

Strang argues that TNA fails to state a claim for breach of the non-compete covenant because TNA fails to adequately allege damages. (ECF No. 6-1 at 9-11.)   Strang directs the court's attention to *ForceX, Inc. v. Technology Fusion, LLC*.  No. 4:11cv88, 2011 WL 2560110 (E.D. Va. June 27, 2011).

Strang's reliance on *ForceX* is misplaced.  As an initial matter, the *ForceX* court did not apply Maryland law and the matter was before the court on a motion for expedited discovery.  2011 WL 2560110 at *1, 7.  The *ForceX* court analyzed whether the plaintiff had demonstrated it would suffer irreparable harm in the absence of expedited discovery.  *Id.* at *7.  The court explained:

> Paragraph 33 constitutes the only factual assertion of irreparable harm made by Plaintiff. Although the potential loss of customers to ForceX would no doubt have an effect on their revenues and client good will, this is not an unusual type of harm. In all cases where a defendant is breaching their contract or non-compete agreement, the Plaintiff faces a risk of lost revenues or clients. The very point of non-compete agreements, and the litigation that follows in the wake of a breach of a non-compete agreement are remedies to this harm. The Plaintiff has made no showing that irreparable harm will occur in this instance without expedited discovery, nor have they demonstrated any unusual circumstances which would cause the Court to order a divergence from the typical discovery timeline. The Federal Rules of Civil Procedure provide a practical and reliable timeline for Plaintiff to receive all of the information that they have requested in this motion. Because they have not made a strong showing of success on the merits, or of irreparable harm, this Court denied Plaintiff's motion for expedited discovery.

*ForceX, Inc.*,  2011 WL 2560110, at *7.  In contrast to *ForceX*, the instant case is before the court

on a motion to dismiss, and TNA is not required at this stage to show irreparable harm or prove

damages.  *See Philips N. Am. LLC*, 2020 WL 5407796, at *11 (finding that the plaintiff adequately

stated a claim for breach of contract where the plaintiff alleged in part that "it has suffered

irreparable injury and significant damages").

In the instant case, TNA alleges:

> The RCA to which Strang voluntarily agreed was the product of an arm's-length negotiation.
>
> Both Strang and TNA agreed to be bound by the terms of the RCA.
>
> The RCA contains a non-competition covenant, which provides that Strang cannot work for a direct competitor for a period of one year. Ex. 1, Restrictive Covenant Agreement, Section 5.1, at p. 9. The scope and duration of the RCA is narrowly drawn to protect TNA's legitimate business interests.
>
> TNA provided consideration for the one-year non-competition agreement contained by offering Strang employment as a Line Manager.
>
> Strang abruptly left TNA on November 4, 2022.
>
> Strang breached his non-competition agreement when he began working at RSB Logistics on or about December 1, 2022. Strang executed a new employment contract with RSB on or about October 24, 2022.
>
> RSB is a direct competitor of TNA.
>
> Though Strang has purportedly been terminated as CEO of RSB, Strang remains non-responsive to TNA's correspondence. TNA reasonably fears that Strang will continue to violate his non-competition agreement, and that he will do so in a more discrete manner that will not be so easily-detectable as his first failed attempt with RSB.
>
> TNA has suffered and will continue to suffer damages as a result of Strang's material breach of his non-competition agreement, including lost revenues.

(ECF No. 1 ¶¶ 37-45.)   Further, the non-competition covenant provides in pertinent part:

> 5.1.   At all times while employed, and during the twelve (12) months immediately following the termination of employment . . . Employee shall not, directly or indirectly, provide Competitive Services (as defined below) within the Restricted Territory (as defined below) to or for the benefit of a Direct Competitor (as defined below), regardless of whether the services are provided as an employee, owner, manager, director, officer, consultant, or in some other capacity . . . .

(ECF No. 1-1 at 9.)

Construed in the light most favorable to TNA, the Complaint adequately alleges that Strang breached the non-competition covenant.  TNA alleges that pursuant to the RCA, Strang agreed not to provide competitive services to or for the benefit of a direct competitor.  TNA alleges that shortly after Strang's departure from TNA, Strang provided services for the benefit of a direct industry competitor (RSB) that are the same, or substantially the same, as services provided to and for TNA. (ECF No. 1 at 2.)  As a result, TNA alleges that it suffered harm and damages in the form of lost revenue.  Accordingly, TNA adequately alleges a claim for breach of contract as to the non-competition covenant.  *See Philips N. Am. LLC*, *supra.*  Strang's arguments for dismissal largely go to the merits of TNA's claim.  These arguments are better resolved on a Rule 56 motion following a more fulsome record developed through discovery.  The Motion will be denied as to Count III.

### 2.      *Breach of Non-Solicitation Covenant (Count IV)*

Strang argues that TNA fails to state a claim for breach of the non-solicitation covenant because Strang "did not solicit or seek to solicit a single TNA customer," and TNA does not allege otherwise.  (ECF No. 6-1 at 11.)  Strang relies on *Mona Electric Group Inc. v. Truland Service Corporation,* 56 Fed. Appx. 108 (4th Cir. 2003).

*Mona* was before the Fourth Circuit Court of Appeals after the district court granted

summary judgment.  56 Fed. Appx. 108 (4th Cir. 2003).  The *Mona* plaintiff argued that the district

court erred in finding that even if the employment agreement was enforceable, summary judgment

was proper because the defendant did not "solicit."  *Id.* at 110.  In affirming the district court, the

*Mona* court explained:

> Despite Mona's assertion to the contrary, the district court held and
> we agree that the plain meaning of "solicit" requires the initiation of
> contact. Therefore, in order to violate the non-solicitation
> agreement, Gerardi must initiate contact with Mona's customers.
> Mona argues that Gerardi solicited when he submitted estimates to
> Mona's customers. However, this does not fall within the plain
> meaning of "solicit." If Mona intended to prevent Gerardi from
> conducting business with its customers it could have easily stated
> that in the agreement. Taking the facts in the light most favorable to
> Mona, there is no evidence that Gerardi solicited Mona's customers.
> Therefore, summary judgment was proper and the district court is
> affirmed.

*Id.* at 110-11.  *Mona* is procedurally and factually distinct from the instant case.  Most notably, the

instant case is before the court on a motion to dismiss and the RCA explicitly defines the word

"solicit."

Here, TNA alleges:

> The RCA to which Strang voluntarily agreed was the product of an
> arm's-length negotiation.

> The RCA contains a non-solicitation covenant which prohibits
> Strang from soliciting any TNA clients.

> TNA provided consideration for the non-solicitation agreement by
> offering Strang a position as a Line Manager.

> Strang left TNA on November 4, 2022.

> On or about December 1, 2022, Strang began working as CEO for
> RSB Logistics, a direct competitor of TNA.

19

In the press release announcing his appointment as CEO for RSB, Strang telegraphed his intent to poach TNA customers by stating that he would be using his years of expertise to expand the North American nuclear transport market of RSB.

Though Strang has purportedly been terminated as CEO of RSB, Strang remains non-responsive to TNA's correspondence. TNA reasonably fears that Strang will continue to violate his non-solicitation covenant, and that he will do so in a more discrete manner that will not be so easily-detectable as his first failed attempt with RSB.

TNA has suffered and will continue to suffer damages as a result of Strang's breach of his non-solicitation agreement, including lost revenues and lost clients.

(ECF No. 1 at ¶¶ 47-54.)

The non-solicitation covenant provides in part:

6.1.    At all times while employed and during the twelve (12) months immediately following termination of employment, regardless of the circumstances, Employee shall not, through Employee's own actions, or through an agent, representative or other third party acting in concert with Employee, and regardless of whether Employee does them by or for himself alone, or as an officer, director, owner, member, stockholder, partner, investor, Employee, consultant or agent for or on behalf of any other person or entity: (i) Solicit (as defined below) the Nuclear Products and Services (as defined above) business of a Customer (as defined below) by communicating directly with the Customer (regardless of who initiates the communication) when part of the communication by Employee includes a discussion or offer to provide any such Nuclear Products and Services to the Customer that are designed to compete with or replace the products and services that Employer has been or is providing to that Customer . . . (iii) disrupt or attempt to disrupt Employer's business relationship with a Customer (as defined below) or Supplier (as defined below) by directly or indirectly, Soliciting (as defined below), requesting, suggesting, encouraging or advising the Customer or Supplier to cancel,

> terminate, not renew, limit or withdraw all or any portion of its
> business with Employer . . . .

(ECF No. 1-1 at 11-12.)  Solicit is defined in the RCA as "to contact, recruit, cause, induce, influence, encourage, entire, facilitate, assist, or otherwise take away from the Employer." *Id.* at 12.

Construed in the light most favorable to TNA, the Complaint alleges that Strang breached the non-solicitation covenant.  TNA alleges that pursuant to the RCA, Strang agreed not to solicit the nuclear and product services business of a customer by either communicating with a customer and/or disrupting, or attempting to disrupt, the employer's business relationship with a customer by directly or indirectly soliciting, encouraging, or advising the customer.  TNA alleges that shortly after Strang's departure from TNA, Strang indicated his intent to take TNA customers by publicly making a statement that "that he would be using his years of expertise to expand the North American nuclear transport market of RSB."  (ECF No. 1 ¶ 52.)   TNA alleges that, as a result, it suffered harm and damages in the form of lost revenue and lost clients.  Accordingly, TNA has adequately alleged a claim for breach of contract as to the non-solicitation covenant.  Strang's arguments again go largely to the merits of TNA's claim and are not appropriate to resolve at this stage.  Accordingly, the Motion will be denied as to Count IV.

### 3.    *Breach of the Confidentiality Covenant (Count V)*

Strang argues that to the extent TNA claims that the allegedly misappropriated confidential data constitutes a trade secret, TNA's claim for breach of contract as to the confidentiality covenant is preempted by its MUTSA claim.  (ECF No. 6-1 at 11.)

"Subject to certain exceptions, the MUTSA provides the exclusive remedy for the misappropriation of a trade secret." *Structural Pres. Sys., LLC v. Andrews*, No. MJG-12-1850, 2013 WL 3820023, at *5 (D. Md. July 23, 2013) (citing MD. CODE ANN., COM. LAW § 11-1207(a)).

The court finds *Swedish Civil Aviation Admin. v. Project Management Enterprises, Inc.* instructive.  190 F. Supp. 2d 785 (D. Md. 2002).

There, the defendant argued that MUTSA preempted the plaintiff's "claim for breach of duty of confidential relationship because it is based on misappropriation."  *Swedish Civil Aviation Admin.*, 190 F. Supp. 2d at 802.  In denying the motion to dismiss, the *Swedish* court explained:

> The dispute between the parties, then, is over whether [the plaintiff's] claim is "based upon misappropriation of a trade secret." The only Maryland case interpreting MUTSA preemption is *Bond v. PolyCycle, Inc.*, 127 Md. App. 365 (1999). In that case, the court held that "a claim for usurpation of a corporate opportunity, if based solely on misappropriation of a trade secret, cannot survive once a remedy under the MUTSA is obtained." In this context of this count, [the plaintiff] has not claimed that the confidential information appropriated by PMEI in allegedly breaching its confidential relationship with [the plaintiff] was a trade secret. Not all confidential information is a trade secret, but must meet the definition in MUTSA of a "trade secret." PMEI asserts that [the plaintiff] should be held to its characterization in Count I of the confidential information allegedly appropriated by it as a trade secret. However, as shown above, [the plaintiff] may plead in the alternative under the liberal federal pleading standards.

*Id.* (internal citations omitted); *see Structural Pres. Sys., LLC, v. Andrews*, No. MJG-12-1850, 2013 WL 3820023, at *5 (D. Md. July 23, 2013) (concluding that "claims based on Proprietary Information that is not a MUTSA trade secret . . . are not preempted by the MUTSA"); *see also Stone Castle Fin., Inc. v. Friedman, Billings, Ramsey & Co.*, 191 F. Supp. 2d 652, 658-59 (E.D. Va. 2002) (noting that "where courts have found preemption on a motion to dismiss, they repeatedly establish that the information in issue—as alleged—constitutes trade secrets before reaching the preemption question").

TNA alleges:

> The RCA to which Strang voluntarily agreed was the product of an arm's-length negotiation.

> Both Strang and TNA agreed to be bound by the terms of the RCA.
>
> The RCA provides that Strang was prohibited from disclosing or using any confidential and proprietary information relating to TNA for the benefit of anyone other than TNA.
>
> At the time Strang was covertly preparing to leave TNA and join RSB, he emailed himself several files containing confidential TNA data. Strang has not returned this confidential data, or responded to TNA's request that the confidential data be returned.
>
> TNA has suffered and will continue to suffer damages as a result of Strang's breach of confidentiality, including lost revenues and lost clients.

(ECF No. 1 ¶¶ 56-60.)

In Count V, TNA does not cabin its allegations as Strang contends. TNA does not expressly allege that the confidential information Strang allegedly stole in violation of the confidentiality covenant was a trade secret. *See Swedish*, *supra.* In any event, as the parties acknowledge, TNA "may plead in the alternative under the liberal federal pleading standards." *See Swedish*, *supra.*; *Philips N. Am. LLC v. Hayes*, No. ELH-20-1409, 2020 WL 5407796, at *17 (D. Md. Sept. 9, 2020) (explaining that other confidential information could be separate from trade secrets and "even if it is later determined that all of the information qualifies as a trade secret, the alternative pleading need not be precluded at this stage of the proceeding"). Accordingly, Count V is not subject to dismissal on preemption grounds at this stage. The Motion will be denied as to Count V.

### D.      **Breach of Fiduciary Duty (Count VI)**

Strang argues that TNA's claim for breach of fiduciary duty fails because TNA does plead facts to support that TNA suffered harm as a result of Strang's actions. (ECF No. 6-1 at 13.) Strang additionally argues that "TNA conflates non-compete obligations to a fiduciary duty as no

fiduciary duty exists to disclose to an employer a future employment relationship with a competitor." *Id.*

In *Philips North America LLC v. Hayes*, the Judge Ellen Lipton Hollander well explained:

> In July 2020, in *Plank v. Cherneski*, 469 Md. 548, the Maryland Court of Appeals clarified its ruling in *Kann*. The court determined that a cause of action for breach of fiduciary duty can be pleaded in some circumstances. Further, the court stated: A breach of fiduciary duty may be actionable as an independent cause of action, but not every breach of fiduciary claim will entitle the plaintiff to damages at law, and the right to a trial by jury. The court explained that, to establish a breach of fiduciary duty as an independent cause of action, a plaintiff must show: (i) the existence of a fiduciary relationship; (ii) breach of the duty owed by the fiduciary to the beneficiary; and (iii) harm to the beneficiary.
>
> The remedy for a breach is dependent upon the type of fiduciary relationship, and the remedies provided by law, whether by statute, common law, or contract. Therefore, courts should consider the nature of the fiduciary relationship and possible remedies afforded for a breach, on a case-by-case basis. And, [i]f a plaintiff describes a fiduciary relationship, identifies a breach, and requests a remedy historically recognized by statute, contract, or common law applicable to the specific type of fiduciary relationship and the specific breach is alleged, a court should permit the count to proceed. Finally, of import here, [t]he cause of action may be pleaded without limitation as to whether there is another viable cause of action to address the same conduct.

2020 WL 5407796, at *13 (internal citations and quotation marks omitted).  In concluding that the plaintiff adequately alleged a breach of fiduciary duty, the *Philips* court further explained:

> Under Maryland law, every employment contract contains an implied duty [of loyalty] that an employee act solely for the benefit of his employer in all matters within the scope of employment. In particular, an employee may be liable for a breach of fiduciary duty if he or she commits a fraudulent, unfair, or otherwise wrongful act such as misappropriation of trade secrets, conspiracy to bring about mass resignation of key employees or interference with an employer's business opportunities. The misuse of confidential information" can also constitute a breach of fiduciary duty. Although an employee may be at liberty to solicit his former employer's business and employees once the employment

relationship ends, he is still prohibited from soliciting his former employer's customers through misuse of his former employer's trade secrets or confidential information.

The facts in the Complaint adequately set forth that Hayes owed a fiduciary duty to Philips and that Hayes breached the duty during and after his employment with Philips. In particular, Philips alleges that Hayes owed Philips a duty of good faith and loyalty by virtue of his employment relationship. And, Hayes allegedly breached his duty when he took Philips' trade secrets and other confidential information for the purpose of benefiting himself and GE Healthcare. Further, Philips claims that Hayes's conduct has caused, and will continue to cause, financial harm to Philips.

*Id.* at *13-14 (internal citations and quotation marks omitted); *see also EndoSurg Med., Inc. v. EndoMaster Med., Inc.*, 71 F. Supp. 3d 525, 556 (D. Md. 2014) (denying motion to dismiss where employee misappropriated trade secrets and interfered with plaintiff's business relationships).

In the instant case, TNA alleges:

Strang was a high-level Business Line Manager at TNA from July 2022 through October 2022.

As a high-level manager, Strang had common law fiduciary duties to TNA, including the protection of all confidential information connected with and gained through his employment at TNA, as well as the duty to act in the best interests of TNA, with utmost loyalty and honesty to TNA, and the duty to disclose to TNA any adverse information.

Strang intentionally and willfully breached his fiduciary duties to TNA by: (a) working for RSB, a direct competitor of TNA; (b) wrongfully taking and misusing TNA's confidential information for his own benefit; and (c) failing to disclose to TNA that he would be working for a direct competitor, even after explicit inquiries from TNA's top executive.

During Strang's scheme, he never told TNA that he would be taking any of the above actions adverse to TNA's business interests, despite his fiduciary duty of disclosure.

Strang's actions are being committed with the intent to injure TNA and divert business from TNA.

> Strang's actions have caused and will continue to cause TNA
> significant financial damages and other losses.

(ECF No. 1 ¶¶ 62-67.)

Construed in the light most favorable to TNA, the Complaint alleges that Strang owed a fiduciary duty to TNA as a high-level manager at TNA; Strang breached this duty by working for RSB, emailing TNA's confidential information to his personal email for his own benefit, and failing to disclose that he would be working for a direct competitor; and that as a result, TNA has suffered significant financial damages and other losses. Accordingly, TNA adequately alleges a claim for breach of fiduciary duty. *See Philips*, *supra.* The Motion will be denied as to Count VI.

### E.   Conversion (Count VII)

Strang argues that to the extent that TNA claims that the "misappropriated information" constitutes a trade secret, Count VII is preempted by TNA's MUTSA claim. (ECF No. 6-1 at 14.) In the alternative, Strang argues that TNA "fails to state a cognizable claim for relief given its factual inadequacy." *Id.*

"In Maryland, to state a claim for conversion, the plaintiff must allege that the defendant: (1) engaged in a distinct act of ownership or dominion over the personal property of another in denial of his right or inconsistent with it; and (2) had an intent to exercise dominion or control over the goods inconsistent with the plaintiff's rights." *Equity Prime Mortg. LLC v. 1st Financial, Inc.*, No. GLR-17-3754, 2019 WL 859135, at *8 (D. Md. Feb. 22, 2019). "The act of ownership can occur when the defendant acquires the property or when he retains the property longer than the rightful possessor permits." *Id.*

Construed in the light most favorable to TNA, the Complaint adequately alleges Strang converted TNA's information and property. (ECF No. 1 ¶ 70.) TNA alleges that it possessed ownership and dominion over the confidential information, as well as other company data,

information, and equipment. *Id.* ¶ 69. TNA alleges that Strang retains possession of TNA's confidential information. *Id.* ¶ 70. Accordingly, TNA adequately alleges a conversion claim. *See Equity Prime Mortg. LLC*, 2019 WL 859135, at *8 (finding that the plaintiff adequately alleged a claim for conversion where the plaintiff alleged that the defendant converted the plaintiff's property; plaintiff had a right to own and possess all the property; and the defendant was aware of the ex-employees' actions).

To the extent Strang maintains that the conversion claim is preempted by MUTSA, the court disagrees. *See* Section III.C.3, *supra.* In Count VII, TNA does not specifically allege that the confidential information converted is a trade secret. Further, TNA "may plead in the alternative under the liberal federal pleading standards." *See Swedish, supra*; *Hardwire, LLC v. Ebaugh*, No. CV JKB-20-0304, 2020 WL 5077469 (D. Md. Aug. 27, 2020) (concluding "that the conversion claim is a permissible pleading in the alternative under the Federal Rules of Civil Procedure"); *Equity Prime Mortg. LLC*, 2019 WL 859135, at *8 (declining to dismiss the plaintiff's conversion claim as preempted by MUTSA before the plaintiff further specified which information constituted trade secrets). At this stage, before TNA further specifies which items of information are trade secrets, the court declines to dismiss TNA's conversion claim. *See Equity Prime, supra.* Accordingly, the Motion will be denied as to Count V.

### F.      Intentional Misrepresentation – Concealment or Non-Disclosure (Count VIII)

Strang argues that TNA "fails to plead any facts demonstrating 'compensable injury,' which is required to make out a prima facie claim for intentional misrepresentation." (ECF No. 6-1 at 16.) Strang further argues that TNA fails to meet the heightened pleading standard of Rule 9(b). *Id.*

To state a claim for intentional misrepresentation by concealment or non-disclosure, a plaintiff must allege that "(1) Defendant owed Plaintiff a duty to disclose a material fact; (2) Defendant failed to disclose that fact; (3) Defendant intended to defraud or deceive Plaintiff; (4) Plaintiff took action in justifiable reliance on the concealment; and (5) Plaintiff suffered damages as a result of Defendant's concealment." *Nordstrom, Inc. v. Schwartz*, No. GJH-18-3080, 2019 WL 4221475, at *4 (D. Md. Sept. 5, 2019) (citing *Odyssey Travel Ctr., Inc. v. RO Cruises, Inc.*, 262 F. Supp. 2d 618, 628-29 (D. Md. 2003); *see Shaw v. Brown & Williamson Tobacco Corp.*, 973 F. Supp. 539, 551 (D. Md. 1997) (explaining that "plaintiffs must allege either that defendant had a duty to disclose a material fact to them and failed to disclose the fact, or that defendant concealed a material fact for the purpose of defrauding them"). "With respect to the knowledge or scienter elements of the intentional misrepresentation cause of action, the United States Court of Appeals for the Fourth Circuit has noted that 'Rule 9(b) allows conclusory allegations of defendant's knowledge as to the true facts and of the defendant's intent to deceive.'" *Bomar v. Bd. of Educ. of Harford Cnty.*, No. RDB-21-870, 2021 WL 3055612, at *4 (D. Md. July 20, 2021) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)). Moreover, in cases of concealment, the "particularity requirements are less strictly applied." *Shaw*, 973 F. Supp. at 552.

TNA alleges:

> As a high-level Business Line Manager at TNA, Strang had both a duty of loyalty to TNA and a duty to disclose to TNA any adverse employment relationship he had.

> On or about October 28, 2022, Strang provided his notice of resignation to TNA.

> When TNA inquired what company Strang was going to work for, and whether he would be starting employment with a competitor of

TNA, Strang lied to TNA and stated that he had no plans to work anywhere.

TNA would later discover that Strang began working for RSB on or about December 1, 2022, and in fact signed a new employment contract with RSB on or about October 24, 2022.

Strang's application for and acceptance of employment with a direct competitor is a material fact that, as a TNA manager, he was required to disclose to TNA.

Strang's failure to voluntarily disclose his impending employment with RSB in October of 2022 was done with the intent to deceive TNA, with the hope that TNA would not attempt to enforce its non-competition, non-solicitation, and confidentiality covenants.

TNA acted in justified reliance upon Strang's concealment of his future employment plans, and allowed him to continue working for TNA and accessing its confidential data during an additional week-long transition period as a result of this misplaced trust in Strang.

As a result of Strang's misrepresentation by concealment, TNA has suffered material harm. Had Strang revealed, while he was still employed by TNA, that he was planning to go work for RSB, then TNA would have taken immediate action to safeguard its confidential data from Strang and ensure that its trade secrets would not fall into the hands of a competitor.

As a result of TNA's justified reliance on Strang's misrepresentation, TNA has suffered significant damages in excess of $75,000.00.

(ECF No. 1 ¶¶ 74-82.)

Construed in the light most favorable to TNA, the Complaint alleges that Strang knew he was going to work for a competitor; lied to TNA when asked about his future employment; TNA therefore allowed Strang to continue working during the transition period and access confidential data; and, as a result, TNA suffered material harm and damages in excess of $75,000. Accordingly, TNA adequately alleges intentional misrepresentation by concealment or non-disclosure. The court is also satisfied that TNA alleges sufficient facts to comply with Rule 9(b) such that Strang

is on notice of the conduct about which TNA complains.  *See Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999) (noting that "[a] court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that plaintiff has substantial prediscovery evidence of those facts").  TNA alleges that Strang provided his notice of resignation to TNA on October 28, 2022, TNA inquired about his future employment, and Strang lied and failed to disclose this information in October 2022.  Accordingly, TNA's allegations are detailed enough to withstand a motion to dismiss.  The Motion will be denied as to Count VII.

## IV.   <u>CONCLUSION</u>

For the reasons set forth herein, by separate order, Defendant Robert Strang's Motion to Dismiss (ECF No. 6) will be denied.

/S/

_____
Julie R. Rubin
United States District Judge

November 28, 2023